**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATURAL PRODUCT SOLUTIONS, LLC :
:
:
v. : Civil No. CCB-13-436
:
:
VITAQUEST INTERNATIONAL, LLC, *et al.* :

**MEMORANDUM**

Plaintiff Natural Product Solutions, LLC ("NPS") filed this action against defendant Vitaquest International, LLC ("Vitaquest")[1] alleging breach of contract and negligence[2] arising out of an error Vitaquest made while fulfilling one of NPS's purchase orders. Vitaquest has moved for summary judgment, and NPS has cross-moved for summary judgment. The court held a hearing on November 3, 2014. For the reasons stated below, both motions will be granted in part and denied in part.

**BACKGROUND**

The present dispute arises out of a purchase order gone wrong. NPS develops, markets, and distributes natural vitamins and dietary supplements. One of its core products is VirMax, a natural supplement that enhances people's sexual experiences. Although NPS develops its supplements, it does not itself manufacture them; instead, NPS contracts with other companies to make its supplements. (Def.'s Mot. Summ. J. Ex. 2, Gallant Dep. 16, ECF No. 30-3.) Vitaquest is one such manufacturer. In 2009, Vitaquest began accepting purchase orders from NPS to

---

[1] The complaint also names "Garden State Nutritionals, Inc." Because the parties do not dispute that Garden State Nutritionals is an unincorporated division of Vitaquest, the court treats Vitaquest as the sole defendant.

[2] The complaint also included claims for fraud in the inducement and negligent misrepresentation. The parties stipulated to the dismissal, with prejudice, of both claims. (Marginal Order Approving Stipulation of Partial Voluntary Dismissal with Prejudice, ECF No. 27.)

produce and deliver various versions of VirMax.[3] (Gallant Dep. 53-54.) NPS placed its first such purchase order on October 21, 2009. (Pl.'s Opp'n Ex. 1, Purchase Orders, at 2, ECF No. 31-2.) NPS continued to place purchase orders for VirMax with Vitaquest approximately every two months. (*Id.* at 2-8.)

Important to this dispute is the appearance of Pharma Guri, Ltd. ("Pharma Guri"), an Israel-based importer and distributor of vitamins and dietary supplements. On May 24, 2010, NPS and Pharma Guri entered into a distribution agreement, under which Pharma Guri became the exclusive distributor within Israel of VirMax.[4] (Def.'s Mot. Summ. J. Ex. 3, Distribution and Sales Agreement, ECF No. 30-4.) NPS began placing purchase orders with Vitaquest on Pharma Guri's behalf in October 2010. (Purchase Orders, at 9.) At this point, the three entities' business success was partially intertwined: Pharma Guri looked to NPS to provide VirMax, NPS looked to Vitaquest to make VirMax, and Vitaquest looked to NPS for orders.

The procedure by which these three businesses worked was straightforward. Pharma Guri would send to NPS a purchase order specifying the amount of VirMax it needed. NPS would then send to Vitaquest its own purchase order form with relevant price, quantity, and delivery terms. (Gallant Dep. 50.) After receiving NPS's purchase order, Vitaquest would return a purchase order acknowledgment form, which included Vitaquest's standard contract terms and occasionally modified the price term. (*Id.* at 51, 60.) Barring any objection by NPS, the terms set out in Vitaquest's acknowledgment form constituted the contractual arrangement between NPS and Vitaquest. (*Id.* at 55.) There was no production contract. (*Id.* at 33.) Vitaquest would proceed to fulfill the purchase order—by manufacturing the supplement in the

---

[3] NPS argues the parties entered into an ongoing "verbal manufacturing contract." (Pl.'s Opp'n 2.)

[4] Also important are Israeli regulations applying to the sale of VirMax in Israel. Under those regulations, the formula, manufacturer, and distributor for any dietary supplements being imported into Israel needed to be registered with Israel's Ministry of Health. (Gallant Dep. 113.) This process took anywhere from 6 to 18 months. (*Id.* at 71, 89.)

amount specified and then delivering the product, often directly to Pharma Guri—and, upon fulfillment, NPS would pay Vitaquest. (*Id.* at 55-56.)

At some point in 2011, Pharma Guri developed the idea of selling a kosher version of VirMax. (*Id.* at 106.) Because such a version did not exist at the time, NPS asked Vitaquest for help. (Def.'s Mot. Summ. J. Ex 1, Mooney Aff. ¶ 9, ECF No. 30-2.) Vitaquest then located suppliers that could provide kosher-certified ingredients for VirMax. (Gallant Dep. 121.) Once Vitaquest was ready to produce kosher VirMax, NPS placed, in October 2011, its first purchase order of this new version for shipment to Pharma Guri. (*Id.* at 133-34.)

For a while, the relationship worked. Though NPS and Vitaquest did have some disagreements regarding Vitaquest's earlier performance,[5] NPS does not bring this lawsuit to dispute Vitaquest's conduct under each and every purchase order NPS placed with Vitaquest. Instead, NPS is concerned solely with Vitaquest's performance under purchase order 688, which was NPS's third purchase order for kosher VirMax.[6]

The terms of purchase order 688, which NPS placed on May 10, 2012, were like any other: NPS sought 14,000 units of kosher VirMax for production and delivery to Pharma Guri in Israel. But Vitaquest made a significant mistake during its course of performance: on September 9, 2012, instead of shipping 137 cartons of kosher VirMax to Pharma Guri, Vitaquest accidentally shipped 101 cartons of kosher VirMax and 36 cartons of an unrelated product called Pernol. (*Id.* at 178-80; Pl.'s Opp'n Ex. 2, Brosh Decl. ¶ 3.l, ECF No. 31-3.)

Vitaquest's shipping error, which NPS President and CEO Martin Gallant described as a "mistake of epic proportions," (Gallant Dep. 181), caused problems upon arrival in Israel.

[5] Gallant testified to "[d]elivery problems on their end, switching ingredients, lack of response from Mr. Mooney who frequently would not return calls or answer questions." (Gallant Dep. 66-67.)
[6] Though NPS only placed three orders with Vitaquest for kosher VirMax, the record reflects that NPS placed roughly two dozen orders for VirMax variants during their entire relationship. (*See* Purchase Orders.)

Because the shipment's contents differed from what was provided in the shipping documents, Israeli customs detained the shipment. (Gallant Dep. 178.) Although Vitaquest, at NPS's request, instructed its general counsel, Scott Yagoda, to send a letter to Israeli customs officials explaining the mistake, that gesture did not resolve the customs detention. (Def.'s Mot. Summ. J. Ex. 8, Yagoda Email, at 2, ECF No. 30-9; Gallant Dep. 181.) As a result, Pharma Guri, as the intended recipient, was forced to deal with the customs dispute. Though the shipment was eventually released, the parties sharply disagree about the impact of Vitaquest's mistake.

NPS argues Vitaquest's mistake caused serious problems. Pharma Guri was accused of smuggling products into Israel, had to defend a lawsuit alleging the same, and had to begin a new registration process. (Gallant Dep. 104.) NPS, in turn, was obligated to reimburse Pharma Guri for the incidental customs, legal, and freight costs associated with the hold-up. (*Id.* at 182.) More significantly, NPS claims it lost several future orders—and accompanying profits—that Pharma Guri would have placed but for Vitaquest's error. According to NPS, Pharma Guri viewed Vitaquest's mistake as the last straw; Pharma Guri informed NPS that it would no longer accept delivery of kosher VirMax from Vitaquest and that NPS should find a new manufacturer. (Brosh Decl. ¶ 3s.) So NPS began the process of replacing Vitaquest. But, because Israel's regulatory regime required NPS to register any new manufacturer, NPS was temporarily unable to deliver kosher VirMax to Pharma Guri. Thus, NPS lost profits of $182,520 from two orders Pharma Guri allegedly would have placed with NPS in October 2012 and January 2013.[7] (Def.'s Mot. Summ. J. Ex. 7, Pl.'s Second Answers to Interrogs. #2, ECF No. 30-8.)

---

[7] As Vitaquest notes, NPS appears to have vacillated on the number of future orders it claims it lost. Gallant testified in his deposition that NPS lost profits from four future orders in October 2012, January 2013, April 2013, and July 2013. (Gallant Dep. 186.) Later, NPS removed its claim to lost profits from the July 2013 order. (Pl.'s Second Answers to Interrogs. #2.) Presently, NPS asserts a claim for only the first two orders.

Vitaquest, on the other hand, recognizes its "honest mistake," (Yagoda Email, at 2), but asserts NPS has done its own manufacturing—of inflated damages. Vitaquest presents evidence suggesting NPS persuaded Pharma Guri to write a letter indicating that it would not accept any more shipments from Vitaquest.[8] (Def.'s Mot. Summ J. Ex. 4, Gallant-Ofer Emails, at 2, ECF No. 30-5.) Later, NPS apparently convinced Pharma Guri to repeat a statement that, had Vitaquest not erred, Pharma Guri would have placed future orders in 2011 and 2012.[9] (Def.'s Mot. Summ. J. Ex. 12, Gallant-Brosh Emails, at 2, ECF No. 30-13.) In short, Vitaquest believes NPS took affirmative steps to justify, after the fact, a claim to vastly more damages.[10] As further proof of NPS's artfulness, Vitaquest presents evidence suggesting NPS had already begun registering Arnet Pharmaceuticals ("Arnet") as its manufacturer *before* Vitaquest's error occurred. (Def.'s Mot. Summ. J. Ex. 5, Arnet Letter to Ministry of Health, at 2, ECF No. 30-6.)

Vitaquest also paints NPS as an uncooperative nonbreaching party. After Vitaquest bungled purchase order 688, it offered to ship the 36 misplaced cases of kosher VirMax to Pharma Guri at no cost, but NPS refused to accept this offer. (Mooney Aff. ¶ 14.) Vitaquest also wrote a credit memo clearing NPS's account of $19,950.31, (Vitaquest Credit Memo/Emails, at 2, 4, ECF No. 30-11), which NPS does not appear to have completely acknowledged receiving, (*see* Pl.'s Second Answers to Interrogs. #2 (noting $4,426.56 as "Amount Credited by Vitaquest")).

---

[8] In an email dated November 13, 2012, Gallant stated, "As soon as I receive your letter explaining why you will no longer accept product from [Vitaquest] I will file suit." (Gallant-Ofer Emails, at 2.) In an email dated November 19, 2012, Pharma Guri's International Business Development Manager, Ofer Amit, replied, "Please see attached letter you requested. Hope it is ok and serves your purpose. If you would like us to make any changes/additions etc. – just let me know." (*Id.*)

[9] In an email dated July 11, 2013, Gallant asked Brosh, "Can you please send me an e-mail that states if [Vitaquest] had not been late on shipments that you would have placed additional orders in 2011 and 2012. We are still in the legal process[.]" (Gallant-Brosh Emails, at 2.) In an email dated July 17, 2013, Brosh replied, "No doubt if [Vitaquest] production & supply would have been steady, reliable and on-time – we would have sold more product and generated more future sales and market growth for the product – which would have in turn directly resulted in us placing additional Purchase Orders from you in 2011 – 2012." (*Id.*)

[10] Vitaquest also questions the certainty of such orders, especially because Gallant testified he had no knowledge that Pharma Guri expected to purchase kosher VirMax on an ongoing, annual basis. (Gallant Dep. 125-26.)

NPS filed this action on February 8, 2013. Vitaquest moved to dismiss and for a more definite statement. The court denied those motions on July 24, 2013. After completion of discovery, Vitaquest moved for summary judgment on March 14, 2014. NPS cross-moved for summary judgment on March 31, 2014. The court held a hearing on November 3, 2014.

**ANALYSIS**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and quotation marks omitted).

**I. Breach of Contract Claim**

To prevail on a breach of contract claim under Maryland law, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt., Inc.*, 988 F. Supp. 2d 542, 550 (D. Md. 2013) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). Two contractual obligations are at issue here: purchase order 688 and the ongoing supply agreement NPS alleges existed between the parties. Vitaquest does not appear to dispute either that purchase order 688 constituted a contractual obligation or that it subsequently failed, due to its packing mistake, to fully perform that obligation.[11] This "mistake" is unequivocally a breach of purchase order 688. *See, e.g.*, Restatement (Second) of Contracts § 235 cmt. b (1981) ("When performance is due, however, anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial."). Vitaquest claims, however, that NPS suffered no damages from this error, given that Vitaquest did everything in its power to make NPS whole with respect to that specific transaction.[12] NPS disagrees, arguing Vitaquest breached not only purchase order 688, but also an ongoing supply agreement, of which Vitaquest's breach allegedly caused NPS to lose substantial collateral profits. Thus, the parties' remaining dispute centers on two issues: (1) whether a contract other than purchase order 688 existed and (2) whether and to what extent NPS suffered legally cognizable damages from Vitaquest's breach. Each issue is addressed in turn.

---

[11] Vitaquest concedes it made an "inadvertent packing error" when it "errantly included 36 cases of a different product in a shipment of kosher VirMax™ intended for Israel." (Def.'s Mot. Summ. J. 3, 4; Mooney Aff. ¶ 13-14.)

[12] Vitaquest appears to press the argument that, because it can show NPS suffered no actual damages, Vitaquest cannot be in breach of contract. (*See, e.g.*, Def.'s Mot. Summ. J. 11 ("[T]his case is ripe for summary judgment as NPS did not suffer any damages due to the alleged breach of purchase order 688.").) This argument incorrectly conflates the distinct issues of breach and actual damages. Under Maryland law, a plaintiff can prevail in a breach of contract action even if she cannot prove actual damages. *See Taylor*, 776 A.2d at 651 ("[I]t is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." (citations omitted)); *see also Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 627 (D. Md. 2012) (entering judgment in favor of plaintiff for nominal damages as to breach of contract claim, but entering judgment in favor of defendant as to liability for actual damages on same claim). As explained further below, NPS is entitled to nominal damages here.

**A. Scope of Contractual Obligation(s)**

The parties dispute the existence of a contractual obligation beyond purchase order 688. NPS argues it entered into a "verbal manufacturing contract" under which Vitaquest was "the contract manufacturer" for NPS and the "exclusive manufacturer" of the kosher version of VirMax. (Mooney Aff. ¶ 9; Pl.'s Second Answers to Interrogs. #10; Pl.'s Opp'n 2.) In NPS's view, Vitaquest's admitted mishandling of purchase order 688 therefore breached not only purchase order 688 itself, but also a putative supply contract that the parties entered into orally.[13] Vitaquest claims no such exclusive contract manufacturing relationship existed and, even if one did, it would not comply with Maryland's statute of frauds. Vitaquest is right.

As an initial matter, practically nothing in the record supports the existence of the putative "verbal manufacturing contract" NPS repeatedly asserts. In fact, even NPS's President and CEO testified he was not aware of any production contract between the parties and that any agreement between the parties "would refer back to the purchase order." (Gallant Dep. 33-34.) Vitaquest's officer confirmed that no such "master contract" existed and that, instead, "the parties worked on a purchase order by purchase order basis." (Mooney Aff. ¶ 10.) NPS's contrary assertions in its briefs and at hearing are not sufficient to establish an overarching manufacturing contract. Each purchase order constituted a separate contract.

Even if the record supported the fact that NPS tried to enter into an ongoing manufacturing contract with Vitaquest, a valid contract was not formed. Under Maryland law, contract formation requires "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777

[13] The existence of a separate contractual obligation is relevant in resolving the issue of damages. If purchase order 688 is the sole contract, then the scope of the damages inquiry is limited to damages flowing from breach of that contract and only that contract. But if, as NPS claims, a more substantial, ongoing supply agreement existed between the parties, that fact could expand the scope of damages to which NPS would be entitled.

(4th Cir. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004)) (quotation mark omitted). There is no evidence in the record that the alleged agreement NPS proposed met any of these elements.[14]

Finally, even if an ongoing manufacturing contract had validly been formed, it, being oral, would not comply with Maryland's statute of frauds. Under section 2-201(1) of the Maryland Code's Commercial Article:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Md. Code, Com. Law § 2-201. The putative contract that NPS alleges existed—as one for the manufacture and sale of VirMax—clearly falls within the scope of section 2-201. *Cf. Blank v. Dubin*, 267 A.2d 165, 167-68 (Md. 1970) (holding agreement to sell furniture on consignment was outside statute of frauds). Even under NPS's characterization of the agreement as one to "formulate, manufacture, and prepare the product for shipment to a third party," (Pl.'s Reply 3), the agreement falls within section 2-201's scope. *See Orteck Int'l Inc., v. Transpacific Tire & Wheel, Inc.*, 704 F. Supp. 2d 499, 513 (D. Md. 2010) ("Maryland [law] . . . defines 'contract for sale' to include both a 'present sale of goods and a contract to sell goods at a future time.' It follows therefrom that dealership or distributor contracts fall within the sales provisions of the U.C.C." (quoting *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 376 (Md. Ct. Spec. App. 1983))), *aff'd per curiam*, 457 F. App'x 256 (4th Cir. 2011). The parties agree that this putative agreement was not reduced to a signed writing. So it cannot be enforced.

Accordingly, the scope of Vitaquest's contractual obligation to NPS at issue in this litigation is limited to purchase order 688. Because the record reflects that Vitaquest breached

[14] Moreover, although NPS has not made this argument, the record does not support an implied-in-fact contract.

purchase order 688 by delivering less VirMax than specified in that contract,[15] summary judgment will be granted in favor of NPS on its breach of contract claim.

**B. Damages Amount**

The remaining issue is what amount of damages NPS is entitled to from Vitaquest's breach. Under Maryland law, a plaintiff injured by a breach of contract can recover actual damages based on his expectation interest as measured by:

> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
> (c) any cost or other loss that he has avoided by not having to perform.

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 182 (Md. 2012) (citing *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 532 A.2d 694, 697 (Md. 1987)). Maryland courts have adopted the rule in *Hadley v. Baxendale*, 9 Exch. 341 (1854), which distinguishes between damages "which may fairly and reasonably be considered as arising naturally from the breach" (what Maryland courts call "general damages") and damages "which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract" (what Maryland courts call "special damages"). *Burson v. Simard*, 35 A.3d 1154, 1159 (Md. 2012) (quoting *Addressograph-Multigraph Corp. v. Zink*, 329 A.2d 28, 33-34 (Md. 1974)). To recover actual damages, "they must be proved with reasonable certainty, and may not be based on speculation or conjecture . . . ." *Asibem Assocs., Ltd. v. Rill*, 286 A.2d 160, 162 (Md. 1972) (citation omitted).

If, however, a plaintiff cannot sufficiently prove actual damages, she is still entitled to nominal damages. *See Taylor*, 776 A.2d at 651; *Hooton v. Kenneth B. Mumaw Plumbing &*

---

[15] Vitaquest also appears to argue that its attempts to make NPS whole by crediting NPS's account preclude a finding of breach. Again, this argument conflates the issues of damages and breach.

*Heating Co.*, 318 A.2d 514, 518 (Md. 1974) (reversing trial court's grant of motion to dismiss because "the court proceeded on the incorrect premise that a failure to prove damages compelled a dismissal of the case" and noting that "[i]t is firmly established . . . that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages"); *see also PFB, LLC v. Trabich*, 304 F. App'x 227, 228 (4th Cir. 2008)[16] (holding, under Maryland law, that "even though [plaintiff] failed to provide evidence sufficient to support its claim for lost profits or out-of-pocket expenses, its cause of action for breach of contract cannot fail as a matter of law because [plaintiff] is entitled to, at the very least, nominal damages, if the fact-finder determines there was a breach"). The amount of a nominal damages award is "a mere token" because it is "not compensation for loss or injury, but rather recognition of a violation of rights." *Brown v. Smith*, 920 A.2d 18, 30 (Md. 2007) (quoting *Cummings v. Connell*, 402 F.3d 936, 943 (9th Cir. 2005)) (quotation mark omitted).

The parties hotly contest the actual damages issue. Vitaquest claims NPS has suffered no actual damages whatsoever and that, even if it had, its failure to mitigate precludes recovery from Vitaquest. NPS, on the other hand, claims to have lost profits not only from the product missing from purchase order 688, but also from multiple future orders that Pharma Guri would have placed had Vitaquest not botched purchase order 688. NPS also claims various damages associated with the customs clearing process. A hearing on the issue of damages has, however, clarified the material facts. For the reasons set forth below, NPS is not entitled to any actual damages. Accordingly, NPS will be awarded only nominal damages.

***1. General Damages***

NPS is not entitled to general damages arising out of purchase order 688. General damages are "those which may fairly and reasonably be considered as arising naturally from the

[16] Unpublished opinions are cited for the soundness of their reasoning, not for their precedential value.

breach" itself. *Addressograph-Multigraph Corp.*, 329 A.2d at 34. Such damages are calculated as "the difference between the contract price and the fair market value at the time of breach." *CR-RSC Tower I, LLC*, 56 A.3d at 182 (quoting *Burson*, 35 A.3d at 1159) (quotation marks omitted).

It is true that general damages arose out of Vitaquest's breach. Although purchase order 688 required Vitaquest to deliver 137 cartons of VirMax, Vitaquest's shipment contained only 101 cartons of VirMax. The loss in value NPS suffered from Vitaquest's deficient performance equals the difference between the price it would have received per unit from Pharma Guri ($4.60) and the price it cost to produce each unit ($1.22),[17] multiplied by the number of missing units (3,816). Thus, $12,898.08 is the general damages to which NPS would be entitled.

NPS, however, is not entitled to such general damages here because the record reflects that Vitaquest already made NPS whole with respect to them. Specifically, Vitaquest presented evidence that, shortly after discovering its error, Vitaquest credited NPS's account by $19,950.31 (Def.'s Mot. Summ. J. Ex. 10, Credit Memo, ECF No. 30-11)—almost $2,500 more than the market value of the 3,816 missing units (that is, $17,553.60). And, although NPS previously claimed in its briefing that Vitaquest had not made NPS whole for general damages arising out of purchase order 688, NPS conceded at hearing that the credit sufficiently covered the general damages at issue. Under these facts, NPS is not entitled to general damages.

Further supporting Vitaquest's argument that NPS is not entitled to any general damages is the principle of mitigation. Under Maryland law, a nonbreaching party must "make all reasonable efforts to minimize the loss sustained from the breach" and can recover only those damages it reasonably could not prevent. *Circuit City Stores, Inc. v. Rockville Pike Joint*

[17] Though NPS paid Vitaquest $1.16 per unit, the total unit cost includes the $0.059 it cost NPS to package each unit. (Pl.'s Second Answers to Interrogs. #2.)

*Venture, Ltd.*, 829 A.2d, 976, 990 (Md. 2003) (citing *Sergeant Co. v. Pickett,* 401 A.2d 651, 660 (Md. 1979)). Vitaquest has shown that NPS failed to mitigate here by refusing to accept the missing 36 cartons of kosher VirMax Vitaquest offered to ship, at its own expense, to Pharma Guri. (Mooney Aff. ¶ 14.) The law does not reward NPS for this refusal.

Because Vitaquest has already provided NPS the full amount of general damages to which NPS would be entitled, the court will not award NPS any general damages for Vitaquest's breach of purchase order 688.

***2. Special Damages***

NPS maintains that Vitaquest's breach of purchase order 688 also entitles it to special damages in the form of collateral lost profits from two purchase orders it alleges Pharma Guri would have placed with NPS but for Vitaquest's breach.[18] Vitaquest argues NPS is not entitled to such lost profits on the grounds that NPS has not proven they were foreseeable or reasonably certain. The court agrees with Vitaquest.

To recover lost profits under Maryland law, a plaintiff must prove three things: (1) "a breach by the defendant was the cause of the loss"; (2) "when the contract was executed, the defendant could have reasonably foreseen that a loss of profits would be a probable result of a breach"; and (3) lost profits "can be proved with 'reasonable certainty,' as distinguished from 'certainty.'" *Impala Platinum Ltd. v. Impala Sales, Inc.*, 389 A.2d 887, 907 (Md. 1978) (quoting *M & R Contractors & Builders v. Michael*, 138 A.2d 350, 353 (Md. 1958)). As the Maryland Court of Appeals has recently noted, "the core question for consequential [lost profits] damages is whether they were in the contemplation of the parties when they contracted." *CR-RSC Tower*

[18] Additionally, to the extent that NPS still seeks compensation for the customs and legal fees incurred in association with Vitaquest's breach of purchase order 688, Vitaquest's credit adequately covers those expenses.

*I, LLC*, 56 A.3d at 188. Thus, "consequential lost profits are calculated with reference to what the parties can reasonably be said to have anticipated when they entered into the contract." *Id.*

Here, Vitaquest has presented evidence showing that the lost profits NPS seeks to recover were neither foreseeable nor reasonably certain. Perhaps most significantly, Vitaquest has demonstrated the absence of a supply contract between NPS and Vitaquest. As was made clear at hearing, absent a purchase order—that NPS sent and Vitaquest subsequently accepted—Vitaquest was in no way bound to make any kosher VirMax for NPS. Likewise, absent a binding purchase order, NPS was in no way bound to place future purchase orders with Vitaquest. Each party was free to walk away from the other once it had completed its obligations under each individual purchase order. Under these facts, NPS may not recover collateral lost profits. *Cf. Impala Platinum Ltd.*, 389 A.2d at 891-93, 908 (affirming trial court ruling that allowed purchaser to recover damages for lost profits from seller who breached a supply contract that existed between the parties).

Although the absence of a supply contract is not necessarily dispositive to the inquiry, additional facts support the conclusion that these alleged lost profits were neither foreseeable nor reasonably certain. First, purchase order 688—and, for that matter, all of the purchase orders NPS placed with Vitaquest—never included expectations of any additional future orders. Thus, NPS's claimed future purchase orders simply were not "in the contemplation of the parties when they contracted." *CR-RSC Tower I, LLC*, 56 A.3d at 188. Second, NPS had no preexisting purchase orders with Pharma Guri at the time of breach.[19] The absence of any preexisting

[19] It is true that NPS solicited a post hoc email from Pharma Guri in which Pharma Guri stated it *would have* placed additional orders with NPS. But that mere expression of intent did not evidence a contract. Furthermore, though a binding distribution agreement existed between the parties, section 3.2 of that agreement makes clear that the parties worked on a purchase order-by-purchase order basis. (*See* Distribution and Sales Agreement 2 ("Orders for Products shall be submitted on [Pharma Guri]'s written purchase order . . . . All orders are subject to acceptance by [NPS] in its sole discretion, and [NPS] may reject any order in whole or in part at any time.").)

collateral contract makes it difficult to conclude that NPS's lost profits were reasonably certain. *See Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 939 (Md. Ct. Spec. App. 2007) (noting that Maryland courts have "approved the recovery of collateral lost profits upon proof by the plaintiff that the collateral contracts with third parties *already were in hand* at the time of the breach." (emphasis added)).[20] Third, NPS had, at the time of breach, already become so dissatisfied with Vitaquest's shipping errors that it had brought Arnet into the picture as "*the* manufacturer" of VirMax. (Arnet Letter to Ministry of Health, at 2 (emphasis added).) That NPS was already expecting to place its future orders with Arnet further belies NPS's claim to lost profits from Vitaquest. Fourth, the record reflects a clear absence of reasonable certainty over the amount of profits NPS allegedly lost. NPS originally sought damages for four alleged lost purchase orders, then reduced that number to three. NPS now seeks lost profits for two such orders. This vacillation evidences a lack of reasonable certainty. Moreover, NPS's CEO himself affirmed that he had never discussed with Pharma Guri any expectations regarding the number of purchase orders that would be placed each year. (Gallant Dep. 125-26.) Instead, NPS's sole "proof" that Pharma Guri would have placed additional orders came from a single post hoc declaration solicited from Pharma Guri. NPS's alleged losses are too "speculative, hypothetical, remote, [and] contingent" to be recoverable. *Hoang*, 936 A.2d at 935.

Accordingly, NPS is not entitled to special damages in the form of collateral lost profits from the future orders it claims Pharma Guri would have placed.

[20] To the extent that NPS relies on *Hoang* for the proposition that "proof of already-existing collateral resale contracts" is not "necessary to the recovery of collateral lost profits," 936 A.2d at 943, that reliance is misplaced. The *Hoang* court expressly noted that "[r]eal estate is unique, and certainly is not fungible as are products sold under standing supply contracts. In the case of sales of non-unique products such as minerals and medicines, distributors can secure resale contracts before entering into supply contracts." *Id.* In fact, the court appeared to be distinguishing the facts in *Hoang* from a series of "breach of contract cases *not involving the sale of real estate*," in which proof of a preexisting collateral contract was a primary, if not necessary, element. *Id.* at 939 (emphasis added). Accordingly, if NPS seeks to recover collateral lost profits here, where it distributes a fungible product, it has a higher bar to meet than that deemed met in *Hoang*. NPS has not met that bar.

* * *

Because NPS has not met its burden of proving actual damages—either general or special—the court will award NPS nominal damages in the amount of one dollar ($1.00).

**II. Negligence Claim**

NPS maintains that, even if it cannot prove its breach of contract claim, it has proven a claim of negligence. Vitaquest objects on the ground that Maryland law does not let a party pursue a negligence claim arising solely out of a breach of contract and, alternatively, that NPS has not demonstrated that Vitaquest owed NPS any tort duty. Vitaquest's argument prevails.

Under Maryland law, "[a] contractual obligation, by itself, does not create a tort duty." *Mesmer v. Maryland Auto. Ins. Fund*, 725 A.2d 1053, 1058 (Md. 1999); *see also Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961) ("The mere negligent breach of a contract . . . is not enough to sustain an action sounding in tort."). This principle applies "even when the failure to perform the contract results from the defendant's negligence." *Jones v. Hyatt Ins. Agency, Inc.*, 741 A.2d 1099, 1107 (Md. 1999) (citations omitted).

But this principle does have an exception: "[W]hen an independent duty accompanies a contractual obligation, that independent duty may give rise to a tort action." *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 294 (4th Cir. 2002). In deciding whether such a duty exists, courts consider (1) "the nature of the harm likely to result from a failure to exercise due care" and (2) "the relationship that exists between the parties." *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986). Maryland courts have recognized such an independent duty in various contexts, including those involving vulnerable parties, professional occupations, and principal-agent relationships. *See Jacques*, 515 A.2d at 762 (imposing tort duty on bank that processed loan application for customer "particularly vulnerable and dependent upon the Bank's

exercise of due care"); *id.* at 763 ("The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants."); *Popham v. State Farm Mut. Ins. Co.*, 634 A.2d 28, 36 (Md. 1993) ("It is well settled in Maryland that, like conventional agents, an insurance agent must exercise reasonable care and skill in performing his duties." (quoting *Bogley v. Middleton Tavern*, 421 A.2d 571, 573 (Md. 1980)) (quotation marks omitted)).

No such independent duty accompanies Vitaquest's contractual obligation to NPS. NPS attempts to paints its relationship with Vitaquest as one of a "specialty nature," involving the "specialty formulation and manufacture of dietary supplements and vitamins sold for human consumption." (Pl.'s Opp'n 13.) But this framing is too charitable for what is otherwise a plain vanilla manufacturing relationship between "sophisticated parties in positions of equal bargaining strength." *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 763 F. Supp. 1327, 1332 (D. Md. 1991), *aff'd in part, rev'd in part*, 991 F.2d 98 (4th Cir. 1992). The parties' relationship in no way resembles the unique contexts noted above. Recognizing a tort duty here would be erasing "the fundamental distinction between claims in tort and claims in contract." *Id.* at 1331; *see also 21st Century Properties Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148, 150 (D. Md. 1988) ("The starting point for analysis is the principle that, as a general matter, the relationship of parties in privity . . . should be defined by contract rather than tort law."). Accordingly, NPS may not continue to press its negligence claim.

**CONCLUSION**

For the reasons stated above, Vitaquest's motion for summary judgment will be granted in part and denied in part and NPS's cross-motion for summary judgment will be granted in part and denied in part. Specifically, judgment will be entered in favor of NPS as to its breach of

contract claim, but NPS will be awarded only nominal damages in the amount of one dollar ($1.00). And judgment will be entered in favor of Vitaquest as to (1) liability for actual damages for the breach of contract claim and (2) NPS's negligence claim.

A separate Order follows.

November 13, 2014
Date

/S/
Catherine C. Blake
United States District Judge